**José Granados NAVEDO, et al., Plaintiffs,**

v.

**Héctor Luis ACEVEDO, et al., Defendants.**

**Georgina CARMONA–O'NEILL, et al., Plaintiffs,**

v.

**Marcos RODRIGUEZ–ESTRADA, et al., Defendants.**

**Carmen D. OSORIO–VELEZ, et al., Plaintiffs,**

v.

**Marcos RODRIGUEZ–ESTRADA, et al., Defendants.**

**Civ. Nos. 88–2023 (JAF) to 88–2025 (JAF).**

United States District Court, D. Puerto Rico.

Nov. 30, 1990.

Harvey B. Nachman, San Juan, P.R., Daniel R. Domínguez, Enrique Bray, for plaintiffs.

Manuel D. Herrero, San Juan, P.R., for Electoral Comm'r NPP Francisco González.

José Angel Rey, San Juan, P.R., for Electoral Com'r PPD Eudaldo Báez–Galib.

Luis Sánchez–Betances, San Juan, P.R., for Héctor Luis Acevedo.

David Rivé, San Juan, P.R., for Marcos A. Rodríguez–Estrada.

## OPINION AND ORDER

FUSTE, District Judge.

### I. *Introduction*

On November 8, 1988, a general election was held in Puerto Rico in which one of the contested races was for the position of mayor of San Juan. The candidates were Héctor Luis Acevedo, running as the representative of the Partido Popular Democrático (PPD), José Granados–Navedo, running as the representative of the Partido Nuevo Progresista (PNP), and Ana María Corrada del Río, running as the representative of the Partido Independentista Puertorriqueño (PIP). During the first week of December 1988, Héctor Luis Acevedo was certified as San Juan's mayor by the Commonwealth Elections Commission ("CEE" by its Spanish acronym) with a margin of 29 votes over Granados–Navedo (out of over 200,000 cast). Within a week plaintiffs herein filed these three consolidated cases attacking the results of that election on constitutional grounds. Plaintiffs alleged and continue to allege that they were qualified voters whose ballots were invalidated; that the basis for invalidation either does not conform with the law of Puerto Rico, or that if it does conform with the law of Puerto Rico, the procedure is so fundamentally unfair as to be unconstitutional; that their votes should be counted, and that if they are counted, José Granados–Navedo would be the winner of the 1988 race instead of Héctor Luis Acevedo.

Originally we chose to abstain under the *Pullman* doctrine, sending plaintiffs, in the first instance, to try the issues of Puerto Rico's election law before the courts of Puerto Rico while allowing them to reserve their right to return to the federal forum on the constitutional claims if resolution of the state law issues failed to obviate the need for federal review.[1] *Gra-*

---

1. Although Puerto Rico is not a state, it has been treated as one for purposes of determining is-

nados–Navedo v. Acevedo, 703 F.Supp. 170 (D.P.R.1988); see Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). A long and arduous journey then ensued. Plaintiffs conducted a four-hundred witness trial before the Puerto Rico Superior Court, and appealed the result to the Puerto Rico Supreme Court, both without success. Midway through the state court proceedings, plaintiffs moved this court to stop abstaining and continue the proceedings here. We refused to do so. Granados–Navedo v. Acevedo, 717 F.Supp. 34 (D.P.R.1989). In September of 1990, following the final decision of the Supreme Court of Puerto Rico, plaintiffs returned to us, and we expedited the trial of this matter.[2] We now dispose of all of plaintiffs' constitutional claims on their merits, ruling that any and all of the various irregularities and even illegalities of which plaintiffs complain do not rise to the level of "broad gauge" unfairness[3] which would justify federal court intervention into an area so explicitly and repeatedly reserved to state administration.

## II. Background and Procedural History

When the matter was first presented to us in the form of plaintiffs' request for a temporary restraining order and permanent injunction decertifying Mr. Acevedo, we noted probable jurisdiction with respect to the constitutional grounds but we determined that novel questions of Puerto Rico election law were raised which should be settled by the Puerto Rico courts in the first instance. Granados–Navedo v. Acevedo, 703 F.Supp. at 173. Accordingly, we abstained. Id.; Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Abstention was

particularly appropriate because one of the most hotly contested issues concerned the implementation of an emergency, eleventh-hour procedure set up by order of the Supreme Court of Puerto Rico twenty days before the election which allowed certain voters who did not appear on the regular electoral rolls to vote on election day. Partido Nuevo Progresista (PNP) v. Rodríguez Estrada, 88 J.T.S. 128 (1988). As we stated then, "[c]ommon sense dictates that the Supreme Court of Puerto Rico stands, at least initially, in the best position to decide the merits of a case in which election officials failed to execute properly one of the court's equitable remedies." Granados–Navedo v. Acevedo, 703 F.Supp. at 174. Plaintiffs then took their complaint to the Superior Court of Puerto Rico, while reserving their federal claims. England v. Louisiana State Bd. of Medical Examiners, 375 U.S. 411, 421, 84 S.Ct. 461, 468, 11 L.Ed.2d 440 (1964); Duty Free Shop Inc. v. Administración de Terrenos, 889 F.2d 1181 (1st Cir.1989).

The Superior Court and Supreme Court of Puerto Rico ruled on the various points of Puerto Rico law. Some of the plaintiffs who originally filed with us had their votes adjudicated in that process. Plaintiffs who did not receive satisfaction in the local court return now to us. In addition, new plaintiffs who did not originally file in the federal court, but were brought into the state action by summons as "involuntary" plaintiffs were added to the federal complaint. Since the issues before us are mixed questions of law and fact, we will first set out the legal standards which govern federal intervention in the state electoral process, and then examine the facts we found at trial through a constitutional lens.

sues of federalism, abstention, and comity. We will at times refer to "state" law issues or the "state" courts with reference to the Commonwealth of Puerto Rico's law and courts. Fuller Co. v. Ramón I. Gil, Inc., 782 F.2d 306 (1st Cir.1986). Puerto Rico is considered a "state" for purposes of 42 U.S.C. section 1983, Carbana v. Cruz, 588 F.Supp. 80 (D.P.R.), aff'd, 767 F.2d 905 (1st Cir.1985).

2. The final decision of the Supreme Court of Puerto Rico was handed down on August 31,

1990, Granados–Navedo v. Rodríguez Estrada, 90 J.T.S. 114 (1990). We conducted a trial on the constitutional claims which began on October 9, 1990 and concluded on October 17, 1990.

3. Defined as either intentional interference in the electoral system, or unintentional "irregularities" so widespread as to render the election fundamentally unfair. See Part III, "Federal Constitutional Standard," Infra.

III. *Federal Constitutional Standard*

## A. Federal Intervention in State Elections

 The right of suffrage is "a fundamental political right, because preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886). The Constitution "does not permit ... the exclusion of otherwise qualified persons from the franchise." *Phoenix v. Kolodziejski*, 399 U.S. 204, 209, 90 S.Ct. 1990, 1994, 26 L.Ed.2d 523 (1970). The Constitutional right extends to both federal and state elections. *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). As stated in *Reynolds:*

> A consistent line of decision by this Court in cases involving attempts to deny or restrict the right of suffrage has made this indelibly clear. It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, *Ex Parte Yarbrough*, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 and to have their votes counted, *United States v. Mosley*, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355.

*Reynolds*, 377 U.S. at 554, 84 S.Ct. at 1378.

 The right is not specifically enumerated in the Constitution, but lies poised between due process and equal protection. While suffrage is a "fundamental" right, states have wide latitude in choosing not to hold elections for any particular office. *Rodríguez v. Popular Democratic Party*, 457 U.S. 1, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982). The essence of the protection, then, flows not from the availability *per se* of elections, but in their even-handed application where provided. "[O]nce the franchise is granted to the electorate, lines may not be drawn that are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). The right is "of a person to vote on an equal basis with other voters." *Mobile v. Bolden*, 446 U.S. 55, 78, 100 S.Ct. 1490, 1506, 64 L.Ed.2d 47 (1980); *see* L. Tribe, *American Constitutional Law*, at 1460 (2nd ed. 1988).

The application of the above doctrine to challenges of elections at the state or local level is a complicated affair. Federal intervention is available under 42 U.S.C. section 1983, which creates a private right of action to correct constitutional wrongs committed under color of state law. *Griffin v. Burns*, 570 F.2d 1065 (1st Cir.1978). However, such federal intervention into the state conduct of elections is considered an extraordinary measure, particularly when the wrong complained of does not involve racial discrimination. *Bell v. Southwell*, 376 F.2d 659 (5th Cir.1967) (Even in overt racial discrimination case, court called power to intervene "[d]rastic, if not staggering ...". Federal courts have refused to supplant the state's handling of its election process where the irregularities are "garden variety," *Hennings v. Grafton*, 523 F.2d 861 (7th Cir.1975) (malfunctioning voting machines), and especially where the state law provides corrective procedures. *Cf. Powell v. Power*, 436 F.2d 84 (2nd Cir. 1970) (Republicans erroneously allowed to vote in Democratic primary). As the Circuit stated in *Griffin:*

> If every election irregularity or contested vote involved a federal violation, the court would "be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all matter of error and insufficiency under state and federal law."

*Griffin*, 570 F.2d at 1077, *citing Powell*, 436 F.2d at 86.

There are circumstances, however, in which the errors or unfairness, even if caused innocently and with no scheme to affect the result of the election, may be so "broad-gauged" that it would work a substantial unfairness for the federal court to deny relief. In *Griffin*, 570 F.2d 1065, the First Circuit faced a challenge to a primary election held for the City Council of Providence Rhode Island. Rhode Island law existent at the time of the election permitted absentee and "shut-in" voting for all state and local "elections." The election officials believed, consistent with a practice of seven years running, that the word

"elections" in the statute should be read to include primaries. Absentee ballots for a primary race were prepared and distributed by the local electoral commissioners. Voters were notified by advertisements in local newspapers that the procedure would be available, and 131 of the total of 1356 votes cast were cast using the absentee ballot procedure. The "winner" enjoyed a margin of only 15 votes, including the absentee ballots. Without the absentee ballots, the "winner" would have lost by 90 votes.

The losing candidate challenged the absentee procedure immediately following the election. The Rhode Island Supreme Court ruled that there was no basis under Rhode Island law to allow absentee ballot voting in primary elections. *McCormick v. State Board of Elections*, 119 R.I. 384, 378 A.2d 1061 (1977). The results of the primary were reversed, and a new winner was designated.

The voters then went to federal court, where the district court held that the retroactive invalidation of absentee votes, which had been cast in reliance upon the word of election officials that absentee votes would be counted, violated "an undoubted right, guaranteed by the Constitution, to vote in primary elections on an evenhanded basis together with other qualified voters." *Griffin v. Burns*, 431 F.Supp. 1361, 1366 (D.R.I.1977). The Circuit affirmed the decision, holding in *Griffin*, 570 F.2d at 1077, that:

> [W]hile ... local election irregularities, including even claims of official misconduct, do not usually rise to the level of constitutional violations where adequate state corrective procedures exist, there remain some cases where a federal role is appropriate. The right to vote remains, at bottom, a federally protected right. If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and re-

lief under § 1983 therefore in order. Such a situation must go well beyond the ordinary dispute over the counting and marking of ballots; and the question of the availability of a fully adequate state corrective process is germane.

In *Henry v. Connolly*, 910 F.2d 1000 (1st Cir.1990), on the other hand, the First Circuit refused to intervene in a Massachusetts state referendum procedure which barred a recycling issue from appearing on the ballot.[4] The controversy surrounded the technical requirements of Massachusetts law governing the petition which was required to get the referendum on the ballot. The state constitution required that ten qualified voters subscribe the petition "before them" for it to be valid. The petition in that case had been read over the phone with some sections summarized by the reader to a signer who then sent in a signature on a separate sheet of paper. The Massachusetts Supreme Court interpreted the state constitution to require an actual physical custody by the signer of the petition being signed to satisfy the signing "before them" language, and therefore invalidated the petition.

In affirming the district court's decision which found no constitutional violation, the First Circuit started from the proposition that the Massachusetts court's interpretation of its own law was peremptory. *Henry*, 910 F.2d at 1002; *see also Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967) (a "State's highest court is the best authority on its own law"); *Jackson v. Liquid Carbonic Corp.*, 863 F.2d 111, 115–16 (1st Cir.1988), *cert. denied*, 490 U.S. 1107, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989) (federal court is "bound ... by the actual expression of the state's highest court" on issues of state law). *Henry* noted that as a matter of comity "a federal court cannot presume to sit in direct appellate review of final state court determina-

---

**4.** It might be argued that the *Henry* case and its reasoning are inapposite here since it did not directly involve the right of voters, as such, since the referendum never made it to the polls. We believe that *Henry* is useful here, since the *Henry* court applied similar reasoning as is ap-

plied in voters' rights cases, and drew on those cases as precedent. Similar interests are implicated whether the dispute is the right to get one's candidate or issue on the ballot, the right to vote on election day and the right to have one's vote counted afterwards.

tions in judicial proceedings." *Henry*, 910 F.2d at 1002, *citing District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 476, 103 S.Ct. 1303, 1311, 75 L.Ed.2d 206 (1983); *Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 296, 90 S.Ct. 1739, 1748, 26 L.Ed.2d 234 (1970); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415–16, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923); *Lancellotti v. Fay*, 909 F.2d 15 (1st Cir.1990).

The *Henry* court then examined the procedure, including the interpretation of the state rule as given by the Supreme Court of Massachusetts, and found that the state's procedure, while strict, and the interpretation, while ungenerous, were reasonable, and plaintiffs had shown no fundamental unfairness which would trigger federal court intervention.

■■■ From this exegesis of *Griffin* and *Henry* we can discern our role. We must accept as the "rule of law" of Puerto Rico the interpretation of the local law, procedures, and regulations as given to us by the courts of Puerto Rico. We are required to take into account any curative state procedures which might mitigate the harm of an otherwise questionable rule or practice. Finally, we must determine whether, even after the disposition of this matter before the Puerto Rico courts, errors and irregularities on a grand scale remain. It is important to emphasize that errors must *both* be uncorrected by the state corrective procedures, *and* approach a certain degree of enormity for our intervention to be appropriate. They must permeate the election in a structural way. We cannot invade the state's domain because we disagree with the disposition of a handful of voters here or there.

### 1. *A Note on "Outcome Determinative"*

■■■ "Outcome determinative" in the context of an election challenge is the general concept that the number of votes chal-

lenged would cause a different result in the election at issue. *Saxon v. Fielding*, 614 F.2d 78 (5th Cir.1980). Courts have not held to a rigid application of the rule, nor have they required plaintiff voters to prove the matter to a "mathematical certainty." *Griffin*, 570 F.2d at 1080. Instead, courts look to whether the irregularity *could* have altered the outcome. *Saxon, supra; Coalition for Education in Dist. One v. Bd. of Elections*, 370 F.Supp. 42 (S.D.N.Y.), *aff'd*, 495 F.2d 1090 (2nd Cir.1974). Therefore, in weighing the enormity of the unfairness, whether the alleged errors would be "outcome determinative" of the race at hand is a relevant factor, but is not dispositive. Here, the outcome was close enough, and the number of irregularities charged sufficient for plaintiffs to invoke federal jurisdiction. However, *merely* demonstrating that the number of votes at issue would change the election, and that some irregularities occurred with those votes is not enough. One can imagine an election of one million votes decided by only two votes. Even if voter-plaintiffs could prove that "garden variety" errors occurred with regard to ten votes, votes which might change the election, a federal constitutional claim might still not lie. It must be assumed that states will err at times in conducting and reviewing their own elections, but the federal role is limited to intervening where those failings are systematic. "Garden variety" does not become "broad gauge" by the coincidence of a close election. That the error might change the election results might be a necessary, but is by no means a sufficient condition of a federal claim for relief.[5]

### 2. *A Note on Intentionality*

We believe that after *Griffin* it is First Circuit law that *either* intentional election fraud ("fixing" an election for one candidate or another) *or* unintentional error resulting in broad-gauge unfairness can trigger federal intervention. As the *Griffin* court states, "there is precedent for federal

---

**5.** We outline this scenario not to decide hypothetical issues not before the court, but in order to help illuminate the subtleties of the standard which we must apply today. Distinguishing

"garden variety" from "broad gauge" is a slippery task, and we wish to bare the analytical framework with which we operated as much as possible.

relief where broad-gauged unfairness permeates an election, even if derived from apparently neutral action." *Griffin*, 570 F.2d at 1077. Although we noted probable jurisdiction on the theory that the plaintiffs would prove *purposeful* election fraud, *Granados–Navedo v. Acevedo*, 703 F.Supp. at 173, we recognize that an election can be fundamentally unfair absent an intent to defraud. Presumably, however, a plaintiff capable of proving intentional activity need prove a much smaller scale of wrongfulness than a plaintiff whose claim must rest on a theory of general unfairness. Proof that a president of an electoral commission "threw" the election to one candidate by intentionally destroying five ballots in the face of a four ballot margin might well trigger relief where a malfunctioning voting machine which eradicated hundreds of votes in the same election might not. The former can be said to be more "unfair" than the latter, although both might be said to disenfranchise voters. The buffer between the state practice and the propriety of federal intervention shrinks in direct proportion to the degree of scienter involved.

### B. Jurisdiction

■ Defendants have argued throughout these proceedings that the federal court does not have jurisdiction in this matter precisely because the issues presented do not rise to the constitutional standards raised above. Defendants moved to dismiss for lack of subject matter jurisdiction and this court reserved judgment on that motion. Defendants argue that since the issues of Puerto Rico law were handled by the Puerto Rico courts, no federal jurisdictional claim can possibly lie. In other words, defendants deny that a federal court can make *any* review of a state electoral process at all once the issue had been handled in the state courts, since to do so, according to defendants, would violate the prohibition as stated in *Henry*, 910 F.2d at 1002, that "a federal court cannot presume to sit in direct appellate review of final state court determinations in judicial proceedings."

Defendants' position flies directly in the face of both *Griffin* and *Henry* itself. In both cases the highest court of the state in question had ruled on the issue involved as a matter of state law. In both cases the federal court found that it *did* have jurisdiction to proceed. In both, the federal court accepted the state law as formulated by the state court, and then examined the adequacy of that state rule through a constitutional lens. In *Griffin* the federal question was not what the Rhode Island rule with respect to absentee ballots was, but rather whether that rule itself was fundamentally unfair. In *Henry*, the federal court accepted the Massachusetts Supreme Court's interpretation of the state rule regarding the referendum petition. It was the adequacy of the rule itself that was at issue there. In both cases the courts took jurisdiction without presuming to sit in direct appellate review.

The case at bar, therefore, comes to the federal court in the same posture as the cases in *Griffin* and *Henry*. That the Puerto Rico Supreme Court has examined the issues presented here and has spoken on them as a matter of state law does not, in and of itself, bar federal court jurisdiction.

Defendants' better argument is the less sweeping claim that although the state court ruling on the state law issue does not on its own bar federal constitutional review, there is nothing in the pleaded facts which might lead us to infer that a constitutional inquiry is warranted. Essentially, they argue that the claim under section 1983 is not "substantial". *Griffin*, 570 F.2d at 1070. Defendants argue that plaintiffs' own allegations, both factual and legal, amount to no more than garden variety irregularities, all of which have been cured by the state court proceedings. While we agree that plaintiffs have failed to prove their case on the merits, we do not believe that they improperly invoked the jurisdiction of this court. While the power to intervene must be cautiously employed, the permission to bring the claim before the court should be generously granted. The importance of the right at issue and the inherent difficulty in distinguishing be-

tween real and chimerical deprivations at the pleading stage militate towards a disposition on the merits.

### 1. *Res Judicata*

#### (a) England Reservation

■ Defendants assert that plaintiffs' claim is barred by the doctrine of *res judicata*. The Full Faith and Credit Clause of the Constitution, U.S. Const., Art. IV, § 1, is codified in the federal full faith and credit statute, 28 U.S.C. § 1738:

> Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions from which they are taken.

■ A federal court facing a claim which follows a state court case between the same parties on the same facts must consult state preclusion law to see what effect the state court would give to the prior action. *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); *see Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 523, 106 S.Ct. 768, 771, 88 L.Ed.2d 877 (1986). *Vega Arriaga v. J.C. Penney, Inc.*, 658 F.Supp. 117 (D.P.R.1987). Federal cases brought pursuant to section 1983 are given no special exemption from whatever state rule might be applicable. *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). This is true both for constitutional claims that were *or might have been* litigated in the state court action. *Migra*, 465 U.S. at 83–88, 104 S.Ct. at 897–900. *Isaac v. Schwartz*, 706 F.2d 15 (1st Cir.1983); *Ramírez Pluguez v. Cole*, 571 F.2d 70 (1st Cir.1978). Puerto Rico law generally bars the relitigation in a second action on the same set of circumstances where there is an identity of parties. 31 L.P.R.A. § 3343 (1968). Claim splitting is precluded. *Pagán Hernández v. U.P.R.*, 107 D.P.R. 720, 732–33 (1978), 7 Official Translations at 795. Therefore, under Puerto Rico law, failure to raise all claims as to a particular occurrence in one action may bar their litigation subsequently.

In *Ramírez, supra*, the plaintiff, a former secretary for the municipality of Mayaguez, Puerto Rico, was denied reinstatement. She sued in state court for reinstatement but was eventually denied relief. She failed to raise any constitutional claims in the state court. She then turned to the federal forum claiming a due process violation. The federal court held that her claim was barred by *res judicata*, a holding upheld on the theory that "[t]he doctrine of *res judicata* bars parties from relitigating in federal court all claims that were raised or that might have been raised in an earlier state proceeding founded on the same cause of action." *Ramírez*, 571 F.2d at 71. Since the state court had jurisdiction to hear the constitutional claims, 4 L.P.R.A. § 121, they should have been raised there.

There is, however, an exception to the general rule for parties whose presence in the state forum is only due to the fact that they were shunted to state court by a federal court's decision to abstain from hearing their claim under a *Pullman* abstention. Under *Pullman*, where plaintiffs properly invoke federal jurisdiction and are sent to the state court in order to clarify an issue of state law, the federal court cannot later deny jurisdiction based on the prior state proceeding. *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964); *Duty Free Shop Inc. v. Administración de Terrenos*, 889 F.2d 1181 (1st Cir.1989) (*England* and *Pullman* "permit[ ] the federal court, in effect, to ask a state court to clarify a murky question of *state* law involved in the case, while permitting the plaintiff to *return* to the federal forum for determination of the federal question after the state court has decided the issue of state law"). In a sense, the availability of the *Pullman* abstention supersedes the ordinarily applicable state preclusion rule by allowing for claim splitting. We have no intention of reviewing the determinations of the various voters' claims as a matter of Puerto Rico law. We are interested only in whether the Puerto Rico law which affected these groups of voters comports with the fundamental fairness re-

quired by the federal Constitution, and we find that as to all the plaintiffs who invoked federal court jurisdiction first, their federal court claims are well preserved, and are not subject to being barred by *res judicata*. Their claims are no more susceptible to dismissal on *res judicata* grounds than were the matters litigated in *Griffin* and *Henry*.

Defendants' repeated reliance on cases in which federal courts have held generally that *res judicata* applies to bar federal courts from relitigating section 1983 claims which parties had a full and fair opportunity to litigate in the state court is misplaced, in that these cases merely reflect the general rule and do not take the exception into account. *Migra v. Warren City School District Bd. of Education*, 465 U.S. 75, 84–85, 104 S.Ct. 892, 897–898, 79 L.Ed.2d 56 (1984); *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).

In neither *Migra* nor *Allen* was there any express reservation of federal rights during the state court proceeding as we have in the case before us. *England v. Louisiana State Bd. of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). That *England* reservation survives *Allen* has been explicitly recognized. *Southern Jam Inc. v. Robinson*, 675 F.2d 94, 97 n. 5 (5th Cir.1982). The plaintiffs in our case who originally chose the federal forum for their constitutional claims are properly protected under *England*. They ended up in state court only because we abstained in our first intervention so that the state law issues could be clarified. *Duty Free Shop*, 889 F.2d at 1183; *Fuller Co. v. Ramón I. Gil*, 782 F.2d 306 (1st Cir.1986). For us to deny plaintiffs the federal forum that they chose because they went to state court on the state law issues *as we required* would be a roundabout way for us to decline plaintiffs' proper invocation of federal jurisdiction. Since we can no more "decline the exercise of jurisdiction which is given, than to usurp that which is not given ...," *Cohens v. Virginia*, 6 Wheat. 264, 404, 19 U.S. 264, 5 L.Ed. 257 (1821) (Marshall, Chief J.), we refuse to find these federal constitutional claims barred by *res judicata* effect. Defen-

dants' arguments that the state court proceeding bars our current inquiry ignores the very concept of *Pullman* abstention which entails a federal court taking jurisdiction, staying the federal suit while the parties clarify the state issues in state court, and then restoring the action for the adjudication of federal claims if the need for such resolution survives the state judicial procedure. *Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *Moore v. Sims*, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979). "[A] party has the right to return to the District Court, after obtaining the authoritative state court construction for which the court abstained, for a final determination of his claim." *NAACP v. Button*, 371 U.S. 415, 427, 83 S.Ct. 328, 335, 9 L.Ed.2d 405 (1963); L. Tribe, *American Constitutional Law*, at 201 n. 17 (2nd ed. 1988). While there is *res judicata* effect to the Puerto Rico court decisions on Puerto Rico law, the section 1983 claims, since preserved, are fully intact here.

### (b) "1990" Plaintiffs

There is one group of plaintiffs whose right to consider their federal claims preserved deserves some discussion. The complication arises from the fact that plaintiffs joined this action at two distinct stages in the litigation. The first group, the "1988 plaintiffs" are those who took their claims to federal court originally and ended up in state court only after federal abstention had been invoked, and whose protection from *res judicata* effect is discussed above. The "1990 plaintiffs" are a second group who did not originally file in federal court. Their first induction into this controversy came in a procedure conducted in the Puerto Rico Superior Court in which that court summoned a whole group of voters to appear in that forum as "involuntary plaintiffs". *See Granados–Navedo v. Rodríguez Estrada*, 89 J.T.S. 78 (1989) (Docket Document No. 85, Certified Translation, at 8); *compare Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989) (approval of mandatory joinder in

federal court context).[6] Defendants argue that these 1990 plaintiffs, who appear in the federal forum for the first time now, having already appeared in the state court, are barred by *res judicata.* Defendants argue that the 1990 plaintiffs had a full and fair opportunity to litigate their constitutional issues in the state court, and since they did not invoke federal jurisdiction prior to appearing in state court, they cannot benefit from an *England* reservation of federal rights. *Migra,* 465 U.S. at 79, 104 S.Ct. at 895. We disagree.

In the First Circuit the general rule has been stated that "[i]n order to make an *England* reservation, a litigant must establish its right to have its federal claims adjudicated in a federal forum by properly invoking the jurisdiction of the federal court in the first instance." *Fuller Co. v. Ramón I. Gil, Inc.,* 782 F.2d 306 (1st Cir. 1986). This is true even in the case of a litigant who did not choose to file in state court, but appeared there as a defendant. *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). The failure of the 1990 plaintiffs to file with us first seems to violate the rule as set out in *Duty Free Shop,* 889 F.2d at 1183, that a litigant claiming *England* reservation *must* file in federal court before the state action commences. However, we believe that the manner in which the 1990 plaintiffs came before the federal court excuses them from the general rule. We find that the 1990 plaintiffs, involuntarily brought before the state court after the federal court had already made its abstention, did not have a full and fair opportunity to litigate the constitutional issues before the state court. We believe that the issues that the state court reviewed were already circumscribed by the procedural history of the case prior to the date of entry of the 1990 plaintiffs into the state action, and the 1990 plaintiffs were obligated to litigate in the state forum as they found it. The state court saw itself in the role of effectuating the clarification of state law, while leaving the federal claims to the federal court. Injected into

such a "state law" environment, the 1990 plaintiffs could hardly have been expected to have been given a full airing of *their* federal claims while the 1988 plaintiffs sat by waiting to return to federal court. We distinguish *Allen* and *Migra* on the grounds that in those cases, the state court litigants did have a full and fair opportunity to litigate the federal claims. They were not burdened by a state court proceeding which, prior to their arrival, had already been limited to state law concerns. Accordingly, we examine the federal claims of both the 1988 and 1990 plaintiffs unencumbered by any preclusive effect from the state action (except to the degree that state law issues have been clarified).

### 2. *Statute of Limitations*

■ A last preliminary issue is related to the statute of limitations. In Puerto Rico the proper statute of limitations to be applied to a section 1983 action is the one-year statute for intentional torts. 31 L.P.R.A. § 5298; *Rodríguez Narváez v. Nazario,* 895 F.2d 38 (1st Cir.1990). Although there is no question that the 1988 plaintiffs filed timely (within one week of the election), defendants raise the timeliness of the 1990 plaintiffs. Although defendants mention the issue only in passing and without citing to us which statute of limitations was not complied with, nor on what date that statute began to run, nor when it ran out, we can make short work of defendants' intimation that the 1990 plaintiffs are untimely. The "relation back" doctrine of Fed.R.Civ.P. 15(c) governing amended pleadings allows new plaintiffs who are brought into an action by means of an amended pleading to be treated as if they had filed on the date of the original complaint, even if the date of the amendment is after the passing of the statute of limitations. C. Wright and A. Miller, *Federal Practice and Procedure* § 1688 (2d ed. 1986); Advisory Committee Note to Rule 15(c). Therefore, the addition of the 1990 plaintiffs relates back to the original filing, and their claims are not time-barred.

---

**6.** Some of the 1988 plaintiffs also appeared "involuntarily" in the Puerto Rico court, but we do not find the manner in which they made it to the Puerto Rico court to be significant since they reserved their federal rights after properly invoking federal jurisdiction.

## IV. Facts and Application of Law

Keeping in mind the limited role of federal courts with respect to intervention in state election procedures, we now review the facts as found at trial through a federal constitutional lens.[7]

The electoral process in Puerto Rico is the hands of the political parties.[8] At all levels of the hierarchy within the Electoral Commission (CEE) decisions are made by representatives of the three largest political parties in Puerto Rico, PPD, PNP, and PIP. The highest level of the Commission follows this structure, consisting of one commissioner from each political party. In addition, there is a separate chairman, charged with overseeing the entire process and having the power to decide disputed issues upon which the three commissioners cannot reach unanimity. By law the chairman is of the same party as the governor ruling at the time of the election. During the 1988 election and its vote count, defendant Rodríguez–Estrada, a member of the PPD party, was the chairman. The designated winner of the San Juan election, Héctor Luis Acevedo, is also of the PPD party. Plaintiff challenger Granados–Navedo is of the PNP party. Plaintiff voters presented to this court voted overwhelmingly for Granados–Navedo.

Over 200,000 votes were cast in the San Juan mayor's race. After a count and a statutorily mandated recount.[9] Acevedo

---

**7.** There are two types of testimony which form part of the record. First, there is the testimony that was received in open court. The parties also stipulated that the testimony of those plaintiffs who appeared in local court would be substantially the same in federal court and so a certified translation of their state court testimony was submitted to this court in lieu of oral testimony.

**8.** Because plaintiffs have implied throughout the trial that the political party in power at the time of the 1988 elections improperly influenced the State Electoral Commission ("CEE" by its Spanish acronym) resulting in decisions relating to the organization and administration of the electoral process being made along party lines, a brief explanation of the structure and the decision-making processes of the CEE is warranted. The CEE is composed of a chairman who is the executive officer of the Commission and Commissioners representing each of the principal political parties. At present, the Commissioners represent the Partido Nuevo Progresista ("PNP"), Partido Popular Democrático ("PPD"), and Partido Independentista Puertorriqueño ("PIP"). 16 L.P.R.A. § 3004. The Commissioners are appointed by the Governor "by petition of the central directing body of the party they represent." 16 L.P.R.A. § 3012. The Commissioners, by unanimous vote, appoint the chairman, alternate chairman, and two vice-chairmen for a four-year term. The chairman and his alternate are members of the same political party whose candidate for governor had obtained the majority of votes in the last general election and the first and second vice-chairmen are appointed from the parties who won the second and third largest vote totals, respectively. 16 L.P.R.A. § 3005. The Commission is "responsible for planning, organizing, structuring, directing and supervising the electoral body and all electoral procedures that govern any election to be held in Puerto Rico." 16 L.P.R.A. § 3013. At the local level, the law requires the establishment of a Permanent Registration Board in each municipality. This Board is composed of one representative from each of the local political parties. 16 L.P.R.A. § 3024a. This electoral body is responsible for the registering, transferring, and relocating of voters, as well as photographing voters for their voter ID cards. Id. The Permanent Registration Board prepares reports of these activities which are submitted to the Local Electoral Commission for approval. Id. The law also provides for the establishment of a Local Election Commission ("LEC") in each electoral precinct. 16 L.P.R.A. § 3029. These boards are constituted by a chairman who is a Municipal Judge, a Judge of a Court of First Instance, or a Justice of the Peace and who is appointed by the Chief Justice of the Supreme Court of Puerto Rico, and by regular and alternate members of the principal political parties. Id. At the monthly LEC meetings, the board reviews and decides cases of registration, transfer, and relocation that are processed and submitted by the Registration Boards. These latter Boards are permanently joined to the LECs. Id.

The LEC mirrors the CEE in various procedural aspects. Both organisms require the presence of the chairman and two members to constitute a quorum. 16 L.P.R.A. §§ 3014(b), 3031. Decisions of the boards must be by unanimous vote of the commission members with the chairman not voting. Id. at §§ 3014(e), 3031. Where unanimity cannot be reached by the commission members, the chairman decides and that decision is deemed to be the decision of the Board. Id. Provisions are made for appealing CEE decisions to the Superior Court, 16 L.P.R.A. § 3016a, with review in the Puerto Rico Supreme Court. 16 L.P.R.A. § 3016b.

**9.** A recount of an election is required wherever the margin after the first count is less than 100 votes or less than 1% of the total votes cast. 16 L.P.R.A. § 3271.

was certified as the mayor of San Juan with a winning margin of 29 votes. The supporters of Granados–Navedo immediately began the legal challenges which are the subject of the present action. During the legal skirmishes in the Commonwealth courts by supporters of Granados–Navedo, Acevedo's margin of victory grew to 49 votes. The relevant number for our purposes is the post-judicial review margin of 49 votes in favor of Acevedo.

The plaintiffs here fall into three basic categories, which we now describe:[10]

A. Initialed Ballots (Civil No. 88–2024)

█ The court certified a class for these 355[11] voters, all of whom had their votes annulled for having written their initials on the outside of the paper ballot with which they voted for mayor. Under Puerto Rico's election law, a voter is not supposed to identify his or her paper ballot in any way. Any initialed ballots fall into a cate-

gory called "protested" ballots. The definition of a protested ballot includes those ballots which bear "initials, words, marks or designs of any kind other than those permitted to cast a vote." 16 L.P.R.A. § 3003(36); Rule 78(c), *Reglamento Oficial Elecciones Generales 1988* ("1988 Rules"). By law, protested ballots must be sent to the CEE and cannot be counted at the local polling place. 16 L.P.R.A. §§ 3261, 3264. The CEE must individually examine the ballots and decide whether they should be assigned. 16 L.P.R.A. § 3268; Rule 71, *1988 Rules.* The Commission has within its discretion the power to count or annul the ballots as it sees fit, based on the circumstances. The CEE determined that the initialed ballots considered here could not be counted and the Puerto Rico courts ratified this decision as a matter of Puerto Rico law. Plaintiffs now challenge that decision.[12]

---

**10.** In all three categories of voters, plaintiffs generally claim that they (a) were qualified voters; (b) had the right to vote and have their vote counted; (c) followed the voting procedures mandated by election law; and (d) were denied their rights because of errors of the electoral organism. Puerto Rico Election Law states the definition of a qualified voter.

> Any citizen of the United States of America and of Puerto Rico domiciled on the Island, who has attained the age of eighteen (18) years on the date of an election, is duly qualified prior to the same, and is not legally barred from voting, shall be an elector in Puerto Rico.

16 L.P.R.A. § 3053. The law further provides that

> [e]very person who is qualified as an elector and wishes to exercise his electoral rights has the obligation to register and to acquire an electoral identification card pursuant to the provisions of this subtitle. Likewise, every elector, if he is to exercise his voting rights, must do so on election day in the precinct and electoral unit in which he is registered.

16 L.P.R.A. § 3052.

**11.** The original number of voters in this class was 357 voters. In the local court proceedings, after hearing the evidence, the trial court ordered that two of the votes be counted, leaving 355 members of this class.

**12.** This decision of the CEE was appealed by the PNP to the Superior Court of Puerto Rico, San Juan Part, on November 18, 1988. The trial court affirmed the CEE's determination and this decision was appealed to the Puerto Rico Supreme Court, *Partido Nuevo Progresista (PNP) v.*

*Marcos Rodríguez Estrada,* 88 J.T.S. 155 (1988). In affirming the trial court's decision, the majority ruled that a presumption is raised against any marked ballot which can only be overcome by the voter proffering evidence sufficiently explaining the reason for the irregularity. 88 J.T.S. 155 at 6511. Because of the Puerto Rico Supreme Court decision, the trial court judge then heard the testimony of 41 voters who testified as to the instructions that they received in the individual polling places. Polling place officials also gave testimony as to what transpired with these voters. *Granados Navedo v. Rodríguez Estrada,* Civil No. KAC88–2133 (1008) (May 10, 1990), Certified Translation, Docket Document No. 84, at 22–23 (hereinafter cited as "Docket Document No. 84"). The local trial court found that while the voters acted in good faith, they were not induced by election officials to place the initials on the ballot. *Id.* at 22–24. The court rather found that factors such as hearing impediments, lack of fluency with the Spanish language, and voter's lack of attention to polling officials' instructions caused the errors to occur. *Id.* at 24–29. Using the total number of ballots cast at the polling places where plaintiffs who testified claimed they received misleading instructions, the court also found that less than .01% of the voters who cast ballots placed their initials on the reverse side. *Table I, Id.,* at 30. The court concluded that plaintiffs had not presented sufficient evidence to demonstrate inducement by polling place officials and concluded that the determination of the CEE should stand. *Id.* at 43.

The Supreme Court of Puerto Rico affirmed the trial court's decision. The court reviewed

Plaintiffs claim that the San Juan voters who initialed their ballots in San Juan did so in response to purposefully misleading instructions at the polling place given by polling place officials.[13] The plaintiffs claim that in Toa Baja, another municipality outside of San Juan, similar events occurred and the votes were counted by the CEE in that situation.[14] The gravamen of this part of plaintiffs' complaint, therefore, rests in the supposedly disparate treatment that the San Juan voters who initialed their ballots received compared to the Toa Baja voters who did the same thing.

The Puerto Rico court found, as a matter of fact, that the San Juan voters had not been induced by polling place officials, but that the initialing occurred in the ordinary course of isolated misunderstood instructions. The initialing involved a small number of voters in each polling place, and accounted for a total of only .01% of the total votes cast. There was no evidence that any one polling place was swamped with initialed votes (as one would expect if polling officials were purposefully confusing voters in particular districts), nor did the testimony by voters who initialled their ballots, either before the local court or before us, support the proposition that a scheme to mislead voters took place. Nor did the evidence support the theory that confusing instructions were given in more than a few isolated instances.

In Toa Baja, on the other hand, polling place officials informed the CEE that they had in fact erred, and had given instructions that had caused some sizable portion of the voters there to initial their ballots. The CEE concluded, *on those particular facts* that the initialing of votes was not the fault of the voters, and that, within the discretion of the Commission, those votes should be counted.

In light of the fact that Puerto Rico law gives the CEE the discretion to count or not count marked ballots, (assuming some rational basis for the decision), and taking the facts as found by the Puerto Rico courts, we see nothing objectionable in the determination by the CEE to count the Toa Baja votes and not the San Juan votes. We see no reason to quarrel with the CEE's implicit determination that the voters in the two situations were not similarly situated, that the Toa Baja voters had been misled as a group in a way that the San Juan voters had not. Far from finding a broad-gauged constitutionally-cognizable violation of voting rights, we see the CEE's solution to the problems presented by these votes as eminently reasonable, and the Puerto Rico judicial review of the process wholly sufficient. Consistent with our limited review role in this type of case, we have examined Puerto Rico law as set out by its own courts, we have accepted the fact finding of the Puerto Rico courts, and we find no constitutional infirmity in the

the earlier proceedings, including its own decision in *Granados Navedo v. Rodríguez Estrada,* 89 J.T.S. 63 (1989), where it ruled that the CEE's November 1988 decision to void the initialed ballots was presumed valid and within the scope of the CEE's authority. *Granados–Navedo v. Rodríguez Estrada,* 90 J.T.S. 114 (1990), Certified Translation, Docket Document No. 56, at 25.

13. The testimony of Vicente Trelles–Peralta provided an example of what occurred at the polling place with this category of voters. Mr. Trelles–Peralta testified that he voted following the usual procedure. Trial Transcript, Vol. II at 152. He testified that before entering the booth a polling place official, while giving him the pencil used to vote, also gave him instructions that "after voting I should fold the ballot in four. I should put *my* initials on top." *Id.* at 153. At trial, following a discussion by counsel

of whether *my initials* is the correct translation of the Spanish word "las iniciales", Mr. Trelles–Peralta was again asked the wording of the instructions he received. He responded by saying that he was told to put *the* initials on the top. *Id.* at 154. Although he interpreted "the initials" to be his own, the initials actually referred to those of the polling place inspectors who must initial each ballot as part of the preparation of the ballots on election day. 16 L.P. R.A. § 3228.

14. Toa Baja is a separate municipality from San Juan. Toa Baja voters do not participate in the San Juan mayor's race. The CEE, however, oversees both elections. Plaintiffs therefore claim that the counting of the initialled ballots in Toa Baja, although not a part of the San Juan election at all, set a precedent that the CEE was obligated to follow in all elections throughout the island.

entire procedure. We therefore hold that plaintiffs have failed to prove a federally-cognizable constitutional violation here.

■ Plaintiffs also raise what is best described as a procedural due process claim with respect to the San Juan/Toa Baja initialed votes. In Toa Baja, after receiving reports from the polling place officials themselves that they, the officials, had given confusing instructions, the CEE interviewed those officials in determining whether to count the Toa Baja votes. In San Juan, no such "hearing" was held. Plaintiffs claim that the CEE's failure to provide a hearing on the San Juan ballots violated their due process rights. Puerto Rico law does not require that a hearing be held. We cannot imagine imposing on the CEE, charged with the enormous task of administering an island-wide election, the burden of holding a hearing for each decision they make. We do not believe that due process requires that any person who casts a ballot is entitled to a hearing before that ballot can be annulled for any reason. The practical reality of elections require that the CEE (or any election board) make its determinations on the basis of the infor-mation which it deems relevant. We do not think it impermissible that the Commission, faced with its own officials admitting error in Toa Baja, sought to make a small inquiry into the situation. At the same time, we see nothing wrong with the CEE, seeing no evidence of errors in San Juan (especially in light of the minuscule number of marked ballots per polling place in San Juan), not calling for a hearing, but merely evaluating the marked ballots on their face. Finally, the procedures and decisions by the CEE are fully reviewable in the local courts. In this case, the local courts, from the Superior to the Supreme Court, spent substantial time and energy reviewing the claims regarding the initialed ballots. We are convinced that these plaintiffs received all the process to which they were due.

## B. Added-by-Hand (Civil No. 88–2023)

The so-called "added-by-hand" voters are eighty-six individual plaintiffs all of whom voted on election day by means of a special procedure called "added-by-hand",[15] but whose votes were later not counted. In Puerto Rico, the general rule is that a voter must appear on the list of qualified voters on election day in order to be eligible to

---

**15.** Puerto Rico election law defines as persons entitled to vote in the general elections "every elector duly qualified as such who appears in the General Register of Electors." 16 L.P.R.A. § 3203. The CEE must maintain two distinct registers. The General Register of Electors, an alphabetical listing of voters, is prepared from the Register of Electors which contains all of the registration information and changes relating to each voter. 16 L.P.R.A. § 3062. When a voter fails to vote in a general election, his or her name is excluded from this latter list of active electors. *Id.* From the Register of Electors, the CEE prepares the voter lists used on election day. Only voters whose names appear on these electoral lists are eligible to vote. In 1988, a significant number of otherwise qualified voters were left off the qualified voter lists. On October 1, 1988 the PNP Commissioner proposed an amendment to the 1988 Rules outlining the added-by-hand procedure whereby voters who were otherwise qualified could vote in the November 1988 elections. This procedure was specifically designed for voters who were left off voter lists because of administrative errors of the CEE. It was never designed to provide an alternative voting procedure for voters who were excluded from the electoral rolls for reasons outlined in the electoral law. After the Commission rejected the PNP Commission-er's proposed amendment, he appealed the decision to the Puerto Rico Supreme Court. On October 20, 1988 the court ruled in the Commissioner's favor and ordered the CEE to implement the added-by-hand procedure. *See Partido Nuevo Progresista (PNP) v. Rodríguez Estrada,* 88 J.T.S. 128 (1988). On election day, voters who utilized this procedure were initially evaluated as to eligibility at the various polling places in each electoral unit, given a special authorization to vote added-by-hand, and sent to the last polling place of the unit to vote. There the voter cast his vote, placed his ballots, voter ID cards, and authorization card in an envelope and completed an affidavit printed on the outside of the envelope. On this affidavit the voter swore that he was a qualified voter who was entitled to vote by this special procedure. The envelopes of these voters were to be maintained apart from the regular ballots and were not to be canvassed at the local level. Instead, they were sent to the CEE to be evaluated at the general canvass. 88 J.T.S. 128 at 6332. At the general canvass, a special board was constituted to evaluate the qualifications of Added–By–Hand voters before opening the envelopes and assigning the ballots. Like all other CEE boards, this board was constituted by members of all three political parties.

cast a ballot. In 1988, however, as in previous elections, a procedure was set up in the month prior to the election to allow voters whose names did not appear on the qualified voter list, but who claimed qualified voter status, to vote on election day. The voter's name was literally "added-by-hand" to the pre-printed voter list. The voter signed an affidavit attesting to legal qualified voter status and submitted his or her voter identification card. A vote cast in such a way was subject to a later verification by the CEE after election day. Essentially, the procedure was to benefit those voters whose names were inadvertently removed from the voter list without reason. Approximately 4,000 voters took advantage of the procedure. Of those, approximately 70% had their votes counted. The eighty-six who appear before us were of the 1,200 or so whose votes were not assigned.

Within the group of eighty-six added-by-hand plaintiffs are three subgroups: those "excluded for domicile" (47), those found to be "inactive" (32), and those not assigned for miscellaneous reasons (7).

### 1. Added-by-hand: Excluded for Domicile

■ A voter's registered domicile is subject to "challenge" by petition to the CEE in a set period prior to each election. The procedure is set up to allow the parties to purge the rolls of persons who have moved out of the voting district or are using a fraudulent address. The challenge is based on a charge that the person's address as registered with the CEE is incorrect.[16] If the challenge is sustained by the CEE, either upon the merits after hearing or, more commonly, upon the voter's default, the voter's name is removed from the list of qualified voters and put on a list

of "excluded" voters. The "excluded for domicile" plaintiffs before us voted "added-by-hand" on election day, but their votes were not assigned later when it was determined that they were in fact "excluded."[17]

Plaintiffs claim that the domicile challenge procedure was full of irregularities, (primarily a lack of notice to the voter whose right was being challenged), and that being allowed to vote added-by-hand was the only way to correct for such irregularities. It is plaintiffs' position, therefore, that anyone whose "exclusion" was "wrongful", either because the challenge procedure was not followed and/or because the challenge decision was wrong on the merits (*i.e.*, the voter continues to live at the registered address) should have had his or her "added-by-hand" vote assigned.

Leaving aside for the moment the adequacy of the challenge procedure itself, the primary weakness in plaintiffs' claim here is that the Supreme Court of Puerto Rico, which itself ordered the implementation of the added-by-hand procedure three weeks prior to the election, has ruled that the procedure was never intended to be used by "excluded" voters, but was only available for qualified voters whose name appeared on neither the qualified nor excluded list, the presumption being that the omission was due to administrative error by the CEE. *Granados–Navedo v. Rodríguez Estrada*, 90 J.T.S. 114 (1990).[18] The added-by-hand rule itself states generally that the procedure is not available to voters "excluded for domicile." (Plaintiffs' Exh. 49, translation ours). Plaintiffs claim that any voter who was excluded on the basis of a faulty challenge falls within the general category of voters left off the list due to errors of the Electoral Commission,

---

16. As a means of purging voter registration lists, Puerto Rico election law provides a challenge procedure whereby a voter's registration may be challenged for age, citizenship, address given on the voter registration application not electoral domicile at the time of challenge, or double registration. 16 L.P.R.A. § 3073. A person successfully challenged on these grounds will be removed from the Register of Electors and placed on a list of excluded voters. *Cf.* Defendant's *Exhibits 2 & 3,* Island–Wide and Supplementary Exclusion Lists.

17. For some reason, of the 47 excluded before us, two did not appear on the list of excluded. We need not concern ourselves with such minor discrepancies.

18. Excluded voters could seek and obtain court order to restore them to legal status prior to election day, and thereby, upon presentation of the court order, vote added-by-hand, but none of the plaintiffs here did so.

and is not a voter "excluded for domicile" because of the possibly faulty nature of the exclusion.

While plaintiffs' reading of the added-by-hand rule might be reasonable, we are bound by the highest state court's pronouncement on its own law. *Henry*, 910 F.2d at 1002. It is the rule of Puerto Rico that the added-by-hand procedure was not designed to allow excluded voters to participate. The document setting out the procedure specifically mentions excluded for domicile voters as being eligible to vote added-by-hand *only* if they have a court order to show that their status as excluded had been purged.[19] The interpretation given such language by the Puerto Rico Supreme Court is that excluded voters *without* such an order could not vote added-by-hand.

Plaintiffs' claim that the "excluded for domicile" should have had their votes adjudicated under the added-by-hand process is unavailing, and we reject it. There is nothing inherently unfair, unequal, or unconstitutional about not extending the added-by-hand procedure to voters previously determined to be "excluded". The added-by-hand procedure was set up specifically to deal with the perceived problem of ministerial omissions from the lists. It was not intended to rectify failings of the domicile challenge procedure. If there is a problem with the domicile challenge procedure which led to plaintiffs' exclusions, that issue must be met on its own terms.

■ Plaintiffs' attack on the challenge procedure (though at all times argued as a predicate to the argument that their votes should have been counted as added-by-hand) centers on the inadequacy of the notice to challenged voters.[20] Plaintiffs

claim that the Commission failed to notify the excluded voters that they were being challenged, resulting in decisions by default. In fact, in the vast majority of cases, the voter's file shows an affidavit swearing to an attempt to personally serve the voter in question. In addition, the lists of excluded voters were published at least twice prior to the elections in the major local newspapers in the country. The lists were published with a large banner stating that these were EXCLUDED VOTERS and that interested voters should check the list to protect their right to vote.

While the "one attempt" at service in the challenge procedure, followed by publication, may not be the most comprehensive method of assuring notice, we believe that the overall procedure, including the repeated posting of the names of excluded voters in newspapers of broad circulation, was sufficient to pass muster as adequate state corrective procedures. Were we to design an election procedure from scratch, we might not rely on a challenge procedure such as the one at issue here. However, we cannot say that the 47 plaintiffs excluded for domicile (especially those 29 who moved without changing their electoral domicile) have been so unfairly treated as to justify our intrusion into the electoral results of 1988. We are dealing with a handful of voters, and a procedure that, while certainly not laudable for its procedural safeguards, includes publication notification which has a high likelihood of resulting in actual notice even where the attempt at personal notice is ineffective.

We also note that even were we to assign all of these 47 votes to Granados–Navedo, it would not be outcome determinative, since the total margin is 49. While these voters, with their complaint about the chal-

---

**19.** The CEE also provided an additional administrative procedure which allowed a voter on the excluded list to completely re-register, and thereby appear on a supplemental "qualified voter" list on election day.

**20.** As for the merits of the challenges of the voters before us, 29 in fact did live at different addresses than the address listed with the CEE, most because they moved without notifying the CEE. The remaining 18 lived at the same address but did not receive notification of the

challenge and presumably did not see their names in the newspaper. Several plaintiffs had moved only within their own voting unit. The law provides that such a person can vote without reregistration. A person who moves within the same unit, and is unchallenged, can show up on election day and still vote. If challenged, one can defend on the merits of the charge by showing that one lives at a different address but in the same unit.

lenge procedure, may come closest to stating a federal constitutional violation of all those presented to us, on their own they are not sufficient to change the election.

### 2. *Added-by-Hand: Inactive Voters*

■ Thirty-two of the eighty-six added-by-hand voters were classified as inactive. Their names did not appear on either the qualified voters list or the excluded list. They were therefore allowed to vote added-by-hand, subject to verification. At the verification stage these voters did not have their votes assigned, as they were found to be "inactive", that is, it was determined that they had failed to vote in either 1980 or 1984 and had failed to re-register after not voting.[21]

Specifically, of the thirty-two "inactive" voters, nine claim that they had voted in the 1984 elections. However, their signatures do not appear next to their names on the pre-printed 1984 voting lists, as they should if they had voted. The local courts held that carrying a perforated voter ID card was not proof sufficient to overcome the presumption raised by the lack of a signature on the voter list.[22]

Another thirteen claimed to have voted added-by-hand in 1984. The Puerto Rico courts held that the added-by-hand procedure in 1984 (as in 1988) was a special last minute procedure for voters to overcome ministerial errors that had dropped them from the usual list. Therefore, the court reasoned, anyone who did not appear on the pre-printed list in 1984, and was given the chance to vote added-by-hand, should have been well aware that they were not on the qualified voter list, and that they were required, if they wanted to be properly returned to the bona fide voter list, to re-register or otherwise correct their status.[23]

■ At first this seems a harsh interpretation. If someone did in fact vote in 1984, why consider them "inactive"? The rationale of the Puerto Rico courts becomes clearer when put in perspective. The added-by-hand procedure in place in 1984 was very freely administered. There is good reason to believe that many ineligible persons (perhaps improperly registered, not in compliance with island residence requirements, etc.), voted added-by-hand and had their votes assigned. The "stricter" treatment of the votes in 1988, then, can be seen as an attempt to purge the system of those ineligible voters who in 1984 erroneously made it onto the added-by-hand list. To merely consider in 1988 as eligible all voters who voted added by hand in 1984 would be to continue to propagate whatever errors had occurred in 1984. While plaintiffs allege that these voters were taken off the lists with no notification, we disagree. As the Puerto Rico courts held, when these voters found themselves off the regular voting list in 1984, they were put on notice that their status was at issue. While this is not an inevitable conclusion on these facts, we find it is not a constitutionally infirm one. As in *Henry*, the strictness with which a state interprets its own law only trespasses on constitutional rights where it is so harsh as to be unreasonable. We do not find that situation here.

■ The final ten inactives (of the thirty-two) are a miscellaneous sample of persons who made late attempts to re-register (5), appeared on the excluded list (1), had multiple voter ID cards (1), or had no voter file or an incomplete one (3). First, we note that the local court evaluated the merits of these voters. Second, we find that their claims, being individually based and not "systemic", are inherently outside the scope of federal review.

### 3. *Added-by-Hand: Miscellaneous*

■ The last seven plaintiffs in the added-by-hand category represent voters who:

---

**21.** To be an eligible voter under Puerto Rico law, one has to either vote in the elections that are held every four years or re-register after any missed election.

**22.** Defendants put into evidence hole punchers which are widely available in stores in Puerto Rico and which are similar to those used at polling places. The point was made that the "punch" on an ID card was not definitive proof that its bearer voted.

**23.** *See* Docket Document No. 84 at 70–77.

(a) voted as prisoners and had to follow a special procedure; (b) did not produce a birth certificate within the specified time and therefore were never fully registered, even though they were issued voter ID cards; or (c) had incomplete or confusing voter files. It should be noted that the local court examined each voter's record and where it appeared to the court that the vote should have been assigned by the CEE, the trial court did so. Docket Document No. 84, pp. 78–91. Like the ten miscellaneous "inactives", these voters present unique, non-systemic complaints. We cannot, consistent with our federal role, reopen the local court review of these votes. Seeing no structural infirmity surrounding the decision not to count these votes, we rely on their treatment in the local courts.

#### 4. *Added-by-Hand: Conclusion*

We find that the procedure and decisional standards applied to these votes, including the judicial review which they underwent, was wholly sufficient. Plaintiffs, in their zest to have every vote cast assigned, seem to forget that the integrity of the system requires not only that bona fide votes be protected, but that improperly cast votes be annulled. Puerto Rico's law and its courts' application of the law on the topic of the inactive voters can be viewed as a necessary adjustment following a period where policing of the qualified voter lists had become lax. While we might have assigned some of the votes before us if we sat as the court of first instance, we can identify no systematic failure in the treatment of these voters. There is no fundamental flaw in this procedure creating an unfairness which could possibly warrant our intervention.

### C. "Arrested" Votes

#### 1. *Discussion*

■■■ Our final group were 207 voters who also voted added-by-hand, but whose complaint is different than the so-called "added-by-hand" voters listed above. The added-by-hand procedure required that each voter's ballot, along with his or her voter ID card, be placed in a specially pre-

pared envelope which had the affidavit (swearing to status as a bona fide eligible voter) printed on the outside. It was essential to the procedure that one envelope per voter be used, since the verification process required that the ballot cast stay connected to the ID card of the voter who cast it so that once the voter was found either eligible or ineligible, the proper ballot could be either counted or discarded.

The Commission failed to print and distribute enough envelopes for all the polling places. In most polling places, the officials improvised, using other envelopes and copying the affidavit on the outside, but maintaining in some fashion the ability to pair up voter ID card and ballot. Unfortunately, at six polling paces in San Juan the officials merely stuffed all the ballots and all the ID cards into one or a few envelopes. The result was that the post-election verification process was thrown off owing to the difficulty of matching up ID cards with ballots cast. (These votes were termed "arrested" since they were pulled out of the general count procedure for special consideration.)

The Puerto Rico courts examined the 207 votes in the "mixed" envelopes. After the Puerto Rico Supreme Court ruled that the local trial court should hold a full evidentiary hearing with respect to all of the voters whose votes were not adjudicated, *see Granados–Navedo v. Rodríguez Estrada*, 89 J.T.S. 63 at 6893 (1989), the Superior Court reexamined and ruled on the status of the 207 voters. The local court heard testimony from the polling place officials who described the irregularities which occurred at each polling place and examined all of the documentary evidence. Docket Document No. 84 at 112–13.

The Puerto Rico trial court found that 98 of the 207 ballots corresponded to qualified voters (as a result of checking the voter ID cards in the envelopes). *Id.* at 116. However, because not all the ballots could simply be matched up with the qualified voters' ID card, the local court had to determine *which* of the ballots were cast by the

98 qualified voters.[24] The local court assigned as many of the 98 ballots as could be properly identified.[25] The local court took testimony to aid in assigning some votes. When votes from all but 38 of the 98 voters determined to be qualified had been assigned, and no further procedure to match qualified voter with ballot cast was available, the local court "proportionally" assigned the final 38 votes. That is, they assigned the 38 votes to the three candidates proportionally, based on the percentage of the total vote which each candidate had won in the four polling places from which these 38 "lost" ballots were taken. The assumption was that these 38 voters, in all likelihood, cast their votes in a manner similar to the other voters in their area. Having determined that these were qualified voters, the local court found it a lesser evil to proportionally assign them than to strike them entirely.

These findings of the trial court were affirmed by the Puerto Rico Supreme Court. Docket Document No. 56 at 16–24. The Supreme Court found that the formula of proportional addition comports with Puerto Rico election law in that it is a less drastic alternative to that of calling a new election. *Id.* at 21–23. As the court said, "[o]ne is dealing with the post electoral application of a rational formula to distribute a very limited number of votes (38) within a universe of some two hundred thousand (200,000) votes." *Id.* at 23.

### 2. *"Urn" Votes Compared to "Arrested" Votes*

In addition to claiming, on the merits, that the envelope-stuffed added-by-hand votes should have been counted, plaintiffs also make a disparate treatment claim with regard to these votes. Plaintiffs point out that in some polling places without envelopes, instead of stuffing all the added-by-hand votes together, the polling officials simply placed the added-by-hand ballots directly into the regular voting urns along with all the regularly-cast votes. The result was a small number of added-by-hand ballots mixed in with 2,500 "regular" ballots. Since the ID was not placed in the urn with the ballot, the added-by-hand ballots in the urns were indistinguishable from the regular ballots. The CEE decided to allow all the votes in the urns to be counted, although to do so would result in some unverified added-by-hand votes being counted. Presumably, the evil of throwing out 2,500 regular votes outweighed the benefit from keeping a few unqualified votes from being counted. Plaintiffs claim that both the stuffed envelopes and the

**24.** In fact, the local court was able to determine for each of the six polling places the total number of arrested votes, the number of qualified voters, and those that corresponded to unqualified voters. For example in Precinct 1, Unit 26, College (polling place) 8, there were a total of 27 voters. Of these, 18 ballots corresponded to qualified voters and 10 correspondeed to unqualified voters. Therefore, while the total universe was 207 ballots and the total number of those determined to belong to qualified voters was 98, the court analyzed this universe by polling place. *See* Docket Document No. 84 at 116.

**25.** At Precinct 2, Unit 29, College (polling place) 5, the local court found that, because the ballots could be identified, the qualified voters' ballots should be adjudicated. Docket Document No. at 118. This represented 10 of the 98 qualified ballots. In a second polling place, where angry voters refused to let polling officials keep their voter ID cards and demanded that they be allowed to vote, the court ruled that none of the 44 ballots determined to belong to qualified voters should be adjudicated. Docket Document No. 84 at 119–20. The trial court reasoned that a "mob" mentality, where polling officials are threatened and election procedures are intentionally set aside, should in no way be condoned. There remained 44 qualified ballots in a universe of 69 arrested ballots from the remaining four polling places. The trial court then assigned the ballots of another six qualified voters from two of the four remaining polling places where voters came forward and revealed for whom they had voted. *Id.* at 122. Finally, the trial court assigned the remaining thirty-eight qualified voters to the candidates using a prorated distribution formula. *Id.* at 121. Basically this formula takes the number of votes tallied for each candidate and divides it by the total number of votes cast. The court then applies this percentage to the number of qualified ballots and assigns that percentage of the total to each candidate. For example, if a total of 100 votes were cast and 60 were for Candidate A and 40 for Candidate B, Candidate A would have 60% of the vote and Candidate B 40%. If only 50 of the 100 were qualified voters, then 60% of 50 (30 votes) would be assigned to Candidate A and 40% (20 votes) assigned to candidate B.

urns contained votes which were in some sense "contaminated", and that they therefore had to be treated in the same way (all counted or all discarded).

We disagree. The job of the CEE and the later judicial review is to preserve as many eligible votes as possible and to not count as many ineligible votes as possible. In the case of the 207, the votes were all added-by-hand. The court did what it could to identify valid voters and assign them. The CEE and the courts started from the presumption of invalidity and saved what they could.

In the case of the urns, however, only a tiny handful of the total votes in the urns were added-by-hand, the rest were regular qualified voters. To throw the urns out in their entirety would have disenfranchised thousands on the chance that a few unqualified would be counted. The CEE and the courts in this situation started from a presumption of validity, given the overwhelming majority of qualified votes which the urns contained. To adopt the all or nothing rule advocated by plaintiffs would only serve to further exacerbate the errors caused by the lack of sufficient envelopes.

We fail to see that the administrative actions taken by the CEE and reviewed by the local courts regarding the envelope shortage resulted in broad-gauged unfairness or an equal protection violation. While we are suspect of the court's assignment of votes on the percentage formula, we cannot see that those 38 votes, no matter how assigned, could be viewed as broad-gauged in an election where they represent such a minuscule proportion of the total votes cast. We think that counting the 2,500 urn votes and sifting through the 207 arrested votes in mixed envelopes was a well-reasoned attempt to make the best of a messy situation. Plaintiffs urge us to recount each of the 207 votes carefully adjudicated by the local court. Such a request is beyond the scope of our properly circumscribed inquiry.

Finally plaintiffs urge that the very undersupply of envelopes itself was a plot, or that, even if merely negligent, so skewed the election as to be *Griffin*-like in its dimensions. First, we saw no evidence of an orchestrated plan to deprive certain areas or polling places with sufficient envelopes. What we saw was bad planning.[26] As to mere negligence, the total number of votes involved in the envelope fiasco was less than one in one thousand, and many of those were assigned during the judicial review process in the Puerto Rico courts. The standards for intervention as set out in *Griffin* are not even being approached.

## V. Conclusion

Plaintiffs proceeded on two basic theories before this court: The first is that broad scale confusion and errors, though innocently made, so skewed the election that the results must be struck. The second, bluntly stated, is that PPD officials, particularly Rodriguez–Estrada, head of the CEE, used their positions to intentionally throw the election to Mr. Acevedo. In support of these two theories, plaintiffs highlight the host of "irregularities" as set out above. Plaintiffs focus on alleged dis-

**26.** As to the fact that many polling places were not sent sufficient envelopes, which in turn precipitated the later problems, the court heard testimony from Benicio Carmona, the CEE official responsible for the preparation of the supplies sent to the polling places. He testified that the CEE made the decision approving the added-by-hand procedures around October 26, 1988. Tr., Vol. 3 at 4. At that time it was also decided to send 50 envelopes to the last polling place of each electoral unit for the Added–By–Hand voters. *Id.* at 5. Further, Mr. Carmona testified that around 90,000 envelopes were ordered, calculating 50 envelopes for each of the 1,654 polling places and a reserve of 3,500–4,000 envelopes. *Id.* at 5, 7. The valises which were prepared for the polling places and contained the envelopes were inspected by members of all three parties and remained under the control of the CEE at all times up until being delivered to the LECs. *Id.* at 13. There was further testimony explaining that on election day when the polling place ran out of envelopes and the CEE's reserve had been distributed, the CEE made two decisions. First, they ordered the printing of the affidavit contained on the envelope to be reproduced on paper. Second, they instructed the polling places which had run out of envelopes to use the manila envelopes from the permanent registration boards and to await the additional mimeographed affidavits which would be affixed to the outside of the envelopes. *Id.* at 15.

parate treatment, seeming inconsistencies, and the "coincidence" of such a close election going to the candidate of the party in power.

We are sure that the election procedure in Puerto Rico is not free from partisan political decision-making. Its very structure, left in the hands of the parties as it is, almost invites decisions shaded by party loyalty. Though the tripartite structure of the Commission seems to be founded on the principal that the competing party personnel will police each other, and that any advantage gained by one group in one situation will be canceled out by the competition elsewhere, the reality is often less idyllic than the theory.

We are equally convinced, too, that the administration of elections in Puerto Rico is a system rife with curable errors, bureaucratic bumbles, and a lack of adequate planning.

That said, however, plaintiffs failed to carry the difficult burden required by federal case law. No evidence at all pointed to an intentional PPD plot to throw the election. The only facts which *tend* towards that conclusion are the facts that the head of the CEE was a PPD member, that some of the decisions taken resulted in more votes going to Acevedo, the PPD candidate, than Granados–Navedo, and that Acevedo was declared the eventual winner. Plaintiffs' intentionality theory rests on sketchy circumstantial evidence, not of the sort with which we could find, by a preponderance of the evidence, that this was a "fixed" election.

As to unintentional errors, we certainly cannot condone inadequately-supplied polling places, undertrained polling staff, or poorly-kept voter registration information. However, plaintiffs have failed to show any structurally-based, broad-gauged irregularity of the kind that is actionable under federal constitutional law. No single incident described above is, on its own, a fundamental unfairness, and we do not see the amalgam of those errors as adding up to an election that must be set aside.

## VI. *A Final Note*

We cannot close without expressing some concerns. Although we hold today that there is no basis for federal intervention, our decision should not be read as an endorsement of the current state of the electoral process in Puerto Rico. When an election, decided by a mere 29 or 49 votes, becomes so clouded by the type of controversy we have seen here, no one wins, and the voters become the victims.

The bitter disputes surrounding the 1988 race raged at all levels. Though it is our role to leave the issue as it was settled by the Puerto Rico Supreme Court on the subject of this election, even that court itself was a house divided. The Hon. Antonio Negrón García's powerful dissent argued that under local law, Granados–Navedo was the winner of the 1988 mayoralty race. The tone and convincing force of such an opinion, handed down by a jurist who the legal community must agree is the human incarnation of a model judge, should make citizens and leaders alike reflect.

Democracy can only stand and command respect where decisions of the majority are recognized by all sectors as such. Where each and every step of the process is converted into a battleground of challenge and counter-challenge, charge and counter-charge, popular sentiment takes a cynical twist. Active participation gives way to apathetic indifference. Where people begin to lose confidence in the electoral process, and begin to believe that the will of the majority is being subverted, they start considering taking the law into their own hands. So begins the disregard for the very rules that govern organized society.

We should reflect on the duty to restructure the election process. We are facing a decisive plebiscite in the near future. Leaders cannot constitutionally, legally, or morally expose the citizenry during that process to the kind of wrenching disputes that have marred the election at issue here. An opportunity exists for reform. The people demand it. Puerto Rico deserves it.

The right to vote is truly fundamental. For some people deprived of riches and recognition, their only treasure may be

**546**

their right to vote. We must express the deep emotions experienced by us when some of the witnesses, very humble persons, appeared to defend that only treasure. We can only hope that their voter registration cards, evidence soon to be returned, will make it in time for them to re-register before the next election. It would be ironic indeed if those citizens, having waged a two-year legal battle, were to be turned away at the polls once again because this litigation has further obscured their status as voters.

Lastly, we urge the Court of Appeals to review our decision on an expedited basis so as to afford these parties and the citizenry in general with one more view, the final word on the federal claims we have addressed.

Accordingly, we ORDER that judgment be entered for defendants on all three consolidated cases tried herein.

IT IS SO ORDERED.